IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                                                                          CASE NO. 4:02-cr-00036-SPM-AK

JASEN ALLEN BADIA,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 83, Motion to Vacate, by Jasen Allen Badia. The Government has filed its reply, Doc. 101, and Defendant has filed a reply. Doc. 107. The Court conducted an evidentiary hearing in this cause on October 16, 2007, and having now received a transcript of those proceedings, the Court is prepared to proceed to the merits of Defendant's claims. Having carefully considered the matter, the Court recommends that the motion to vacate be denied.

## BACKGROUND

Defendant was indicted for conspiracy to distribute and to possess with intent to distribute more than five hundred (500) grams of a mixture containing cocaine and for possession with intent to distribute more than five hundred (500) grams of a mixture containing cocaine. Doc. 9. Before trial, the Government filed an Information and Notice of Intent advising Defendant that it intended to seek enhanced penalties at sentencing based on the fact

that at the time of the instant offense, Defendant was on probation from Louisiana for attempted possession with intent to distribute approximately 50 pounds of marijuana. Doc. 20. The Government also sought to use the Louisiana conviction as Fed. R. Evid. 404(b) evidence. Doc. 17. The Court denied the motion. Doc. 33. The Government later renewed the motion, which was again denied. Docs. 38 & Oral Order (Oct. 17, 2002).

At trial, Defendant was represented by retained counsel, Paul D. Srygley. The facts at trial established the following:

On May 6, 2002, Federal Express received a package for shipment at a location near the Houston Airport which was addressed to "Terrence Copeland" in Tallahassee, Florida,. Doc. 79. Later that same day, Defendant flew from Houston to Tallahassee. *Id*.

On May 7, 2002, the Tallahassee Police Department intercepted a package, and in cooperation with police, FedEx withheld the package for an insufficient address. *Id*. After obtaining a warrant, the police opened the package and found a brick of cocaine wrapped in several layers of plastic inside the shell of a metal computer box. *Id*.

The police then began surveillance on the apartment delivery address. *Id*. Terrance Montford had been living at the subject apartment for a short time, but Defendant also had access to it. *Id*. Defendant was at the apartment on May 7, and was observed leaving it at approximately 12:30 p.m. *Id*. At 1:20 p.m., a person claiming to be the shipper called FedEx seeking information about the package and leaving a contact telephone number. *Id*. Shortly thereafter, Defendant, who was driving, and Montford arrived at the FedEx facility, and Montford, who had the tracking number, went inside the building to retrieve the package. *Id*. In picking up the package, Montford stuck his fingers through an air hole in the package, and his

fingerprints were found on the computer shell holding the cocaine.  *Id*.  As Montford attempted to put the package in the car, both he and Defendant were arrested.  *Id*.

At the time of his arrest, Defendant had in his possession the cell phone which had been used to call FedEx about the package and had been identified to FedEx as the contact number.  *Id*.  This same phone was used to call "Thyron," identified by police "[f]rom narcotics work," immediately after the call to FedEx was made.  *Id.*; *see also* Doc. 59 at 77-78.  Defense counsel did not initially object to the officer's testimony, but, outside the presence of the jury, the Court admonished the officer that "no other references to other individuals involved in narcotics be brought into this trial against this defendant."  Doc. 59 at 79.  After a recess, counsel advised the Court that he thought the officer's remark was "prejudicial" and requested that it be stricken and a cautionary instruction be given.  *Id*. at 80.  Though counsel was directed to draft a cautionary instruction, he did not submit one for the Court's consideration.  Doc. 40.

Defendant was found guilty on both counts.  Doc. 41.  Subsequently, counsel moved for judgment of acquittal or new trial based in part on the officer's testimony regarding "Thyron," who Mr. Syrgley described as a "well known drug dealer in the Tallahassee area."   Doc. 46.  According to counsel,

> This statement tainted the evidence in this case and ostensibly gave the jury the only link between the Defendant...and any prior, future, or current possession, trafficking or any conspiracy to do the same involving illegal drugs.  No cautionary instruction from the court to the jury would have been sufficient to cure the jury being tainted by this harmful testimony.

*Id*.  The Court denied the motion, finding that the "single reference to 'Thyron' as a known drug dealer in the Tallahassee area was harmless given the strong evidence of Defendant's guilt."  Doc. 51.

Shortly before sentencing, the Government moved for a hearing "to insure that arrangements are made to insure that defendant Jasen Badia will be represented by counsel in the continuation of these proceedings." Doc. 52. This motion was necessitated by Mr. Srygley's 30-day suspension from the practice of law for violating various ethics rules in connection with his representation of clients in unrelated civil matters. *Id*. After conducting a hearing on the matter, the magistrate judge allowed Mr. Srygley to withdraw, and he appointed the public defender to represent Defendant. Doc. 56. Defendant was subsequently sentenced to 120 months imprisonment on each count to run concurrently. Doc. 64.

On appeal, Defendant raised two issues: whether the Court erred in denying the motion for judgment of acquittal on the conspiracy count because there was insufficient evidence that an agreement existed, and whether Defendant was denied a fair trial because of the Government's "'repeated introduction of irrelevant, prejudicial testimony....'" Doc. 79. The court of appeals affirmed, finding no reversible error. *Id*. More specifically, the court found that "sufficient evidence was presented from which the jury could conclude that Badia had conspired with Montford to commit the unlawful act of possessing cocaine with intent to distribute," citing, for example, the fact that Defendant and Montford "were together at the time the package was picked up and the package was addressed to the apartment where Montford resided." *Id*. As to his other claim, the Eleventh Circuit found that the Court did not abuse its discretion in denying Defendant a new trial based on the officer's reference to "Thyron," in light of the "strong evidentiary support for Badia's convictions presented at trial...." *Id*. The court of appeals also rejected Defendant's argument that the Court improperly allowed the officer to "testify about the various calls made with the cellular telephone," concluding that even if there was plain error,

Defendant's "substantial rights were not violated because the evidence of guilt here is overwhelming." *Id*.

The instant motion to vacate ensued. On this occasion, Defendant attacks counsel's effectiveness on two grounds, each of which will be discussed in turn, and raises a claim that his sentence violates *Booker*.

**DISCUSSION**

1.  Ineffective assistance of counsel.

Because Defendant raises the issue of counsel's effectiveness, a review of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697. The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no

competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A

"reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

  A. Conflict of interest.

In his first ground for relief, Defendant charges that counsel "labored over a conflict of interest prior to and during the course of the trial given that he was under an investigation which had criminal implications...." Doc. 83 at 10. According to Defendant, his attorney, Mr. Srygley "in an effort to curry favor with the government, deliberately foregone possible alternative causes of action in this case." *Id*. at 11. More specifically, he claims that counsel failed:

> (1) to obtain handwriting exemplars from Montford "to show he wrote or caused to be written the federal express way bill,"
>
> (2) to secure Montford's financial records "to show he was in debt and in the need of funds,"
>
> (3) to allow Defendant to testify in his own defense to show "whether Mr. Badia was duped into driving to the federal express facility or Montford was the one duped by Mr. Badia,"
>
> (4) to interview Montford's friends in Houston, Texas, "to establish his trips to

and from the suburbs of that city and state,"

(5) to object timely "to hearsay testimony and references made by Officer Hoover regarding non-party's involvement in 'narcotics work,'"

(6) to provide the curative instruction to the Court "regarding Officer Hoover's testimony after the trial judge granted leave to do so,"

(7) to refrain "from taking excess doses of anti-depression [medication] during the course of the trial,"

(8) to discuss with Defendant his right to testify and to advise him that the decision in that regard "was the exclusive decision of Mr. Badia, not counsel," and

(9) to present defense witnesses "who distributed and sold cell phones to Mr. Badia for resale to college students and other consumers."

*Id*. at 11-12.

At the evidentiary hearing, Mr. Srygley testified that his problems with the Florida Bar "had nothing to do with any work that I had done in federal court in representing anybody. It had nothing to do with the U.S. Attorney's Office. It had nothing to do with the federal government...." Doc. 127 at 86. He further testified that to his knowledge, there was no federal or state criminal investigation into the incident. *Id*. When questioned as to whether the disciplinary proceeding impacted his representation of Defendant, Mr. Srygley stated:

> Not directly....I certainly was under a lot of stress because of that. But I had hired an attorney who was representing me. He was advising me how to proceed....certainly a federal criminal trial such as this is very stressful in and of itself. So I would have to say I was probably under more stress professionally and personally than I normally would have been. But I still believe...that the Florida Bar...investigation certainly didn't affect my ability to represent Mr. Badia.

*Id*. at 86-87. According to Srygley, rather than create a situation in which he and Badia's interests were adverse to each other, the investigation instilled in him a "greater desire...to have

Mr. Badia successful...to show myself...other members of the legal community in Tallahassee, family, friends...that I was a capable attorney, very competent." *Id*. at 87.

Counsel admitted that he was under a doctor's care during this time period and that the doctor had increased the dosage of his antidepressant but maintained that he took the amount of medication prescribed and that it "had the desired therapeutic effect" and made him "more attentive, less stressed out, better able to deal with stress as it would come along." *Id*. at 87-88.

As to Officer's Hoover's statement, Mr. Srygley stated that after reflection he determined "strategically and technically...we not have a curative instruction because that would then remind the jury of something that Investigator Hoover had said an hour or two hours later" and he "didn't feel it was important...to remind the jury of something...they may not have even heard the first time" since the comment "was almost like an offhand remark....[I]t was such a fast comment that I was thinking to myself, well, I barely heard him say that." *Id*. at 82-83.

Counsel stated that he tried to develop a regular source of income for Mr. Badia, but Defendant "didn't give me a lot of details" about his cell phone business, and he had "no receipts...documents, anything to show that he was selling a sufficient number of cell phones to be able to provide for his family." *Id*. at 85.  In short, Srygley could not "come up with anything on paper or any witnesses to put on the stand to say that [Defendant] had serious, regular work[.]" *Id*.

With regard to the label on the FedEx box, counsel made a conscious decision not to request an exemplar from Montford.  In his view, because the Government's handwriting expert could not identify the writing has being Defendant's, a fact which went "directly to the government's ability to prove their case," and because he was "trying to basically point the

finger at Mr. Montford since his fingerprints were on the CPU casing inside the box," he determined the exemplar might work against Defendant. *Id*. at 99-101. As counsel put it: "[W]hy give the government an opportunity to go find evidence that they don't think they need or may not realize it or the jury may want to see. If they don't produce it, we can always say they didn't present the evidence to show this." *Id*. at 101-02. Later, he elaborated:

> I felt it best to be able to argue to the jury that the government hadn't done their job investigating this case. In other words, they thought they knew who did this. They quit looking for anybody else and decided to focus on Mr. Badia and not Mr. Montford. If they really wanted to find who did it, they would have checked Mr. Montford's handwriting versus actually getting the government...to perhaps do your job...and do a test; because I didn't know what that test would reveal; i.e., if it turns out that an expert could then...exclude Mr. Montford, that would take away our entire argument on that point that I just gave [that Montford might have written the receipt].

*Id*. at 135-36. He also stated that Defendant gave him no reason to think that Montford had been in Houston prior to the shipment of the package, "other than he could have been or might have been or should have been, but nothing concrete to prove that he was there." *Id*. at 136. At the hearing, Defendant confirmed that he did not know if Montford had any friends in Houston. *Id*. at 56. As to Montford's financial situation, Defendant himself acknowledged that from Montford's testimony, "everybody in the courtroom [assumed] that Montford was in bad financial shape." *Id*. at 55.

Excepting for the moment the issue of Defendant's right to testify, which will be discussed *infra*, the Court has no hesitation in finding that Defendant has failed to prove that a conflict of interest prevented counsel from effectively representing him at trial. Defendant offered no proof that counsel was mentally or physically impaired or that any of his decisions were the result of anything less than full and careful consideration. There is quite simply no

deficient performance in any of the grounds advanced.  Furthermore, as the Eleventh Circuit found, the evidence of Defendant's guilt was overwhelming, and thus, he suffered no prejudice from any alleged errors on counsel's part.

>    B.    Right to testify.

At the hearing, Defendant testified that he and Mr. Srygley "had more than one" discussion regarding whether he should testify at trial.  *Id*. at 38.  According to Defendant, he "wanted to testify [to tell my side of the story] and [Mr. Srygley] told me I wasn't going to testify."  *Id*. at 22.  Defendant acknowledged that Srygley told him that if he testified, the Louisiana conviction "would come out...as a form of impeachment" and that the Government would then be able to get into its specifics because it was relatively similar to the charges at issue in this case.  *Id*.  He also testified that counsel told him that the Government was going to try to get the Louisiana conviction into evidence during its case in chief, but that he was going to seek to exclude that evidence.  *Id*. at 22-23.  According to Defendant, counsel told him that he "wasn't going to testify because he had a strategy," which Defendant "guess[ed] pertain[ed] to that being brought up.  *Id*. at 23.  As previously noted, counsel successfully prevented the Government from introducing evidence of prior bad acts.  Nevertheless, counsel did not, according to Defendant, convince him that "he was right and that [Defendant] shouldn't testify[.]"  *Id*.

On cross-examination, Defendant testified that he has two college degrees, a B.A. in criminology and a B.S. in psychology with a minor in juvenile justice, and that he knew from his college classes that he had the absolute right to testify and that the decision regarding whether to testify lay solely and exclusively with him.  *Id*. at 37-38.  Even so, he testified that when counsel

announced to the Court that he was not going to call any witnesses, he did not take any steps to inform anyone, not even Mr. Srygley, that he wanted to testify. *Id*. at 42-43.

In response to the Court's questions, Defendant testified that counsel told him, "'You are not going to testify because everything in this case is pointing to your favor. You are going to go home, so you are not going to testify.'" *Id*. at 75. He insisted, however, that he told counsel that he wanted to testify anyway, but that Mr. Srygley "told me I wasn't going to testify." *Id*. Defendant stated that he did not argue with counsel further, and that the "final decision was made by him, not me." *Id*. at 76-77.

Counsel's recollection is different. While he agreed that "from the beginning, we had talked about whether or not he would testify," *id*. at 78, and that they were still weighing the decision at the beginning of trial, he "certainly did not keep [Defendant] from testifying." *Id*. at 79-80. Instead, according to Mr. Srygley, he recommended that Defendant not testify because he had successfully excluded reference to the Louisiana drug conviction, and Defendant "accepted my recommendation...." *Id*. at 80. He was adamant that he "didn't tell [Defendant] he couldn't testify" or that he "wouldn't testify" because that "would not be my decision; it would be his." *Id*. at 80-81. Ultimately, Mr. Badia, according to counsel, made the decision not to testify.

Having carefully considered the matter, the demeanor of the witnesses, and their testimony, the Court finds counsel's testimony to be the more credible. Though it would be improper for this Court to credit counsel's testimony over Defendant's simply because there is a conflict in their testimony, *see Gallego v. United States*, 174 F.3d 1196, 1198-99 (11th Cir. 1999), it would be equally improper for this Court to ignore the fact that counsel is an experienced trial attorney and an officer of this Court, and that Defendant is a convicted felon. *See* Fed. R. Evid.

609.  The Court finds it incredible that Defendant, a highly educated and articulate individual, who fully knew and appreciated his unequivocal right to testify in his own behalf, would merely sit back and allow counsel to make a decision which he knew counsel had no right to make. Instead, the Court believes the more credible and probable scenario is that counsel did in fact advise Defendant that he should not testify for the reasons set forth at the hearing--if Defendant had taken the stand, the Government would have unflinchingly cross-examined him about the Louisiana drug conviction, and Defendant would most certainly have been convicted on that basis alone–and that Defendant took that advise to heart and consciously made the decision himself not to testify.  Quite frankly, the Court does not believe Defendant's version of events.

    C.    *Booker*.

*United States v. Booker*, 543 U.S. 220, 244(2005)  is not retroactively applicable to cases on collateral review, as "*Booker*'s constitutional rule falls squarely under the category of new rules of criminal procedure that do not apply retroactively to § 2255 cases on collateral review." *Varela v. United States*, 400 F.3d 864, 868 (11th Cir. 2005).  This claim should therefore be denied.

## **CONCLUSION**

Having carefully considered the matter, the Court finds no merit to any of Defendant's claims.  Accordingly, it is respectfully **RECOMMENDED** that the motion to vacate, Doc. 83, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this 19th    day of February, 2008.

S/A. Kornblum
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.